**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES KLEIN,** | : | |
| | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 15-0065** |
| **KEVIN KAUFMANN, et al.,** | : | |
| | : | |
| **Respondent.** | : | |

**Goldberg, J.**                                                                                 **March 20, 2019**

## MEMORANDUM OPINION

This case involves a double execution-type homicide occurring in 2002. The Petition for Writ of Habeas Corpus seeks relief on the basis of various claims of ineffective assistance of counsel. In a Report and Recommendation addressing these claims, the United States Magistrate Judge recommended that the Petition be denied. Petitioner has filed, *pro se*, Objections to this Report and Recommendation. For the following reasons, I will overrule the Objections and deny the Petition for Writ of Habeas Corpus. However, because reasonable jurists could disagree with the resolution of the constitutional claims at issue, I will grant a certificate of appealability.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 18, 2004, Petitioner was convicted by a jury of two counts of first-degree murder, a violation of the Uniform Firearms Act, and possession of an instrument of crime. The trial court imposed two life imprisonment sentences for the murders and lesser sentences for the remaining offenses.

**A. Facts as Summarized by the State Courts**

The two state courts that considered whether Petitioner's counsel was constitutionally ineffective did not provide an in-depth analysis of the trial record. The facts as summarized by the Pennsylvania Superior Court are as follows:

> The putative prologue to the killings was the kidnapping and beating of Appellant by his eventual victims, Danny Jones and Dwight Jenkins. Appellant had been released when he agreed to lead his captors to the house of one Melvin Marrero, whom Jones and Jenkins had apparently attempted to kill on an earlier occasion. On March 7, 2002, Jones and Jenkins met Appellant at a diner in New Jersey, and drove with him to the 6400 block of Tulip Street in Philadelphia where Appellant shot and killed both men, firing several more shots at the victims before fleeing in a car waiting for him around the corner. He then absconded to Las Vegas, where he was later arrested.

(Resps.' Opp'n to Habeas Corpus Petition, ECF No. 15, Ex. A.)

The PCRA court provided a somewhat more detailed summary of the facts:

> On March 7, 2002, Decedents Danny Jones and Dwight Jenkins left the New Jersey home of their friend, David Foster, to meet Appellant at the Vincenttown Diner. Appellant had arranged to lead the decedents to Melvin Marrero who purportedly resided at 3115 Sterling Street, Philadelphia, PA, and who the decedents attempted to kill a few weeks before . . . . When Decedents arrived at the diner, he got into the back seat of the vehicle Jones was driving and directed Jones to travel over the Tacony Bridge to a large intersection in Philadelphia near Marrero's residence. While en route, Jones used his cell phone to call Foster and related to Foster that the three men were on their way . . . . Philadelphia Police Detective John Cunnings[1] interviewed Marrero and testified that Appellant provided him a signed statement relating that upon entering the Jones' [sic] vehicle, Jones told Appellant they were going to kill Marrero. Appellant then shot both decedents in the back of the head and fled. Appellant explained to Marrero that he shot Decedents because he felt bad for telling them where Marrero was at the time they attempted to murder him. [2]

---

[1]  The Detective's name is actually "Cummings."

[2]  This important fact is incorrect or not clearly stated by the PCRA court. The trial record does not substantiate that Petitioner provided a statement directly to Cummings. Rather, it was Marrero who gave Cummings a statement wherein Marrero related what Petitioner purportedly told Marrero.

> On the day of the killings[,] Philadelphia Police responded to 6446 Tulip Street, Philadelphia, PA where they observed the decedents' bodies in the front seat of the vehicle with the motor still running. Paramedics arrived soon thereafter and pronounced Jones and Jenkins dead. The vehicle containing the Decedents' remains was then transported to the Medical Examiner's Office. Assistant Medical Examiner Bennett G. Preston, MD, conducted postmortem examinations on the bodies and opined that the cause of death of both decedents was gunshot wound[s] to the head and that the manner of their deaths was homicide.

(Id., Ex. B (citations to record omitted).)

Given the sparsity of the state courts' factual summaries and because the facts presented at trial are important to resolution of the issues before me, a more comprehensive recitation of the trial record is warranted.

## B. The Trial Testimony

The jury first heard from Police Officers Adrian Makuch and Officer Edward Schikel, both of whom worked with the crime scene unit of the Philadelphia Police Department. Officer Makuch explained that he processed the crime scene, and stated that the victims were shot while sitting in a Plymouth Voyager minivan on Tulip Street in Philadelphia. (N.T. 10/12/04, 23:17–49:7.) Officer Shikel photographed the minivan, recovered multiple objects from the car, took several upholstery samples for DNA analysis, and performed a fingerprint examination. (Id. at 49:18–64:9.) None of the evidence recovered connected Petitioner to the crime.

The prosecution then called Bennett Preston, M.D., the medical examiner on the case, who testified that he performed the postmortem examinations on the victims and found that they had suffered gunshot wounds to the head, and that one had suffered a gunshot wound to his hand. Dr. Preston described the entry points of the bullets and opined that the cause of death was homicide,

but he was not able to conclude whether the victims were shot from inside or outside of the car. (N.T. 10/12/04, 3:15–18:14.)

David Foster testified that the night before the murders (March 6, 2002), he was "hanging out" at his house with a few friends including the two victims, Jones and Jenkins. Jones told Foster that he was supposed to meet Petitioner later that night at the Vincenttown Diner and then was going to Philadelphia to the house of a man named Melvin Marrero. (Id. at 22:4–24:9.) Although Foster asked if he could go too, Jones told him he did not want anyone else there. (Id. at 25:21–26:12.) Jones and Jenkins left Foster's house and, fifteen minutes later, Jones called Foster and relayed that Defendant was already waiting for them at the diner. (Id. at 25:6–11.) Foster testified that he received a second call from Jones at approximately 11:15 to 11:30 p.m., saying that Jones was on the way to Philadelphia and everything was "fine." Foster told Jones to call him "when he got there and everything was over," but Jones never called him back. (Id. at 28:3–29:25.) After calling Jones about fifteen times, Foster and two friends drove to Philadelphia, towards Marrero's house, arriving at approximately seven or eight o'clock the following morning. (Id. at 29:24–32:25.) At a nearby location, only blocks away from the crime scene, Foster stated that he saw Petitioner and Marrero's brother, Stevie Marrero, coming out of an alley. (Id. at 33:2–25.) Foster made eye contact with Petitioner, after which Petitioner and Stevie Marrero ran back down the alley, crossed the main street, and got into a car. (Id. at 34:2–35:13.) Foster started following Petitioner's car, but lost him at some point. (Id. at 35:17–36:4.)

On cross-examination, Foster admitted hearing that the victims (Jones and Jenkins) were involved with strong-arming and robbing drug dealers, that they had robbed and shot an individual named Ketkarun Boonsong after breaking into his house, and that the victims had "shot up" Melvin

Marrero's car on a prior occasion. (Id. at 38:4–42:3.) Foster also acknowledged that he did not know about the crime scene location until he saw it on the news that morning. (Id. at 43:17–49:7.)

Melvin Marrero, who was serving a sentence for "drugs and guns," then testified that he knew both Petitioner and the victims. (Id. at 61:3–62:13.) The prosecutor presented Marrero with a signed, seven-page, written statement that Marrero provided to police on September 21, 2002, which contained the following information: Marrero had been shot at by the victims on a prior occasion; the victims had previously kidnapped and beaten Petitioner; and Petitioner called him on his cell phone to confess that he had killed the victims, Jones and Jenkins.[3] (Id. at 79:2–84:6.)

Marrero denied the contents of that statement and claimed it was coerced, insisting that police kept him in a room without feeding him, told him he was a suspect in a homicide, and refused to let him call his lawyer. (Id. at 67:13–68:6, 96:7–25.) The only portion of his statement with which Marrero agreed was the portion stating that Jones and Jenkins had previously "shot up" his truck while he was in it. (Id. at 80:3–81:12, 106:23–107:24.)[4]

On cross-examination, defense counsel reaffirmed Marrero's recantation of his statement and also elicited testimony that Petitioner had left the area to work in Las Vegas:

> Q.  Klein ever tell you he killed anybody?
>
> A.  No, sir.
>
> Q.  He left town one time after that, didn't he?
>
> A.  Yes, sir.
>
> Q.  Where was he going?

---

[3]  The trial transcript does not indicate precisely when this phone call occurred.

[4]  As will be detailed *infra*, Marrero's statement also provided detail as to which gun Petitioner used for the murders—a detail that matched physical evidence regarding which gun was actually used.

A.    He went to Vegas to do some work with the Wu Tang clan [a famous rap group].

Q.    With the Wu Tang clan?

A.    Yeah.

Q.    Did you talk to him while he was in Vegas?

A.    No, because I was locked up.    Actually, my brother had spoken with him.

Q.    But you knew he was out there?

A.    I knew he was out there.    My brother told me.

(Id. at 111:4–17.)

The prosecutor followed up on re-direct, also questioning Marrero about Las Vegas and about whether Petitioner had ever used a different name:

Q.    Mr. Wallace asked, you said the defendant left town.    You took him to 30th Street Station, didn't you?

A.    No, ma'am.

Q.    You didn't?

A.    No.

Q.    You didn't take him to 30th Street Station so he could take a train to California and a bus to Las Vegas?

A.    No.

Q.    You didn't do that?

A.    No, ma'am.

Q.    Do you know the name Christopher Arevalo?

A.    No.

Q.    Not familiar with that name?

> A.    I think you asked me that Thursday; right?
>
> Q.    Right.  You are saying that—
>
> A.    Who is that, by the chance?  I don't—you keep asking me that.  I don't even really understand who that is.  Never even heard of that name.
>
> Q.    Did the defendant ever use that name?
>
> A.    I don't know.  I don't believe so.

(<u>Id.</u> at 114:20–115:20.)

Following Marrero's testimony, homicide detective John Cummings took the stand and explained that he was the officer who took and transcribed Marrero's statement.  Cummings testified that Marrero had not been coerced in any way regarding the signed statement and that Marrero plainly stated that Petitioner had confessed to the murders.  (<u>Id.</u> at 119:2–129:10.)  Indeed, Cummings explained that Marrero "was very cooperative, very cordial, and it was actually hard to stop talking sometimes."  (<u>Id.</u> at 123:13–14.)  Cummings denied ever telling Marrero that he was a suspect in a homicide case.  (<u>Id.</u> at 123:15–17.)  Moreover, Cummings indicated that Marrero never complained about not eating or showering and, in fact, at some point in the night, the police ordered pizza for everyone.  (<u>Id.</u> at 124:21–25.)

Catherine Johnson, the girlfriend of victim Danny Jones, also testified about a very brief phone conversation she had with Jones the night before the murder where Jones said he was "going to be late because he was getting up with Klein [Petitioner]."  (<u>Id.</u> at 142:13–24.)  She also remarked that Jones had had a problem with Marrero over money.  (<u>Id.</u> at 144:2–146:24.)  On cross-examination, Johnson was confronted with her prior police statement wherein she told police that Marrero had paid somebody to shoot Jones and Jenkins.  (N.T. 10/12/04, 153:22–154:7.)  Johnson

acknowledged that she made that statement and admitted to knowing that Jones and Jenkins, along with David Foster, had previously "shot up" Marrero's car. (Id. at 154:16–155:3.)

The prosecution then called a second witness who had provided a twelve-page, signed statement to police indicating that Petitioner had confessed to the murders. Ketkarun Boonsong testified that he knew both Petitioner and Marrero. (Id. at 156:14–157:24.) When Boonsong was confronted by the prosecutor with a statement he gave to the police—wherein he stated that Petitioner confessed to killing Jones and Jenkins—Boonsong repeatedly denied giving any such statement. (Id. at 167:14–25, 169:12–178:22 170:15–23.)

The prosecution next presented Detective Egenlauf, who confirmed that Boonsong had, in fact, given him a statement that Petitioner had confessed to the murders. (Id. at 194:24–209:21.) Egenlauf explained that, once completed, he read the entire statement back to Boonsong and had him sign all the pages at once. (Id. at 202:8–17.) Boonsong made no corrections to any of the twelve pages of his statement. (Id. at 202:18–25.) Egenlauf indicated that Boonsong was cooperative throughout the entire course of providing the statement. (Id. at 203:9–14.)

Officer John Quartullo testified that he responded to a call about the victims' '93 Plymouth Voyager sitting on Tulip Street. He explained that he found two males in the front seat that appeared to be sleeping. He called paramedics, who arrived and pronounced the males dead. He indicated that he found a casing on the ground by the passenger side sliding door. (Id. at 214:10–221:17.)

On the next day of trial, Officer Ernest Bottomer, of the firearm identification unit, provided information about the potential weapon used in the murder, confirming that it was a .380 caliber automatic weapon. This was the same weapon Marrero described in his statement where he indicated Petitioner had confessed the murders to him. (N.T. 10/13/04, 4:6–34:6.) Sergeant Patrick

Lamond discussed the traffic, lights, and distance from the Tacony Palmyra Bridge—the area from where the victims drove—to the crime scene.  (Id. at 35:5–41:20.)

The prosecution next called Detective Joseph Centeno, the lead detective on the case. Detective Centeno testified that he went to the crime scene and was present while Marrero was interviewed.  (Id. at 43:20–46:3.)  He explained that his conversations with Marrero, and those of the interrogating officers, were memorialized on an "activity sheet," which he described as a "synopsis or summary of every aspect of the investigation as it happens . . . . It basically tells your bosses what you did today in regards to those murders."  (Id. at 46:4–18.)  Centeno indicated that, at the conclusion of Marrero's interview, Marrero offered him some additional information that was not included in Marrero's written statement and was not memorialized on the activity sheet. Specifically, Centeno began to testify that, "[a]t the conclusion of [Marrero's] statement, I had gone in to speak to him about the incident and at that time he had given me the information of the alias that Mr. . . . ."  (N.T. 10/13/04, 48:19–22.)  Defense counsel interrupted before Centeno could complete his sentence, objecting because: "He is talking about things I know nothing about.  How could I cross-examine Marrero if I don't know what is in an activity sheet, what is coming out of his mouth and what is coming out of somebody else's mouth?  He already said it is a summary. How can I cross-examine the witness on his opinion of what the guy said?"  (Id. at 48:25–49:8.)

The trial court sustained the objection and then inexplicably allowed the testimony to continue without further objection from defense counsel to its hearsay nature:

> Q.     Did Mr. Marrero tell you that the defendant had left town?
>
> A.     Yes.
>
> Q.     What did he tell you about that?

A.    He told me that he had taken him to the train station at 30th Street, and he gave me the information as to what name Mr. Klein was using.

. . .

Q.    When did Mr. Marrerro tell you he had taken Mr. Klein to 30th Street Station?

A.    Earlier in the week.

Q.    What date?  Did he give you a date?

A.    Wednesday, September 18, 2002, at 2:30.[5]  That was for a train that was headed to the West Coast.

Q.    Did he give you any other information with regard to the defendant leaving town?

A.    The name that the defendant was using and the identification he had in his possession.

Q.    What name was that?

A.    That was Christopher Arevalo.

Q.    Based on the information that he gave you with regard to the defendant leaving town and the name Christopher Arevalo, did you do any follow-up investigation with regard to that information?

A.    On that night we had gotten an itinerary together of these travel plans from the train station.

Q.    How did you [do] that?

A.    Over the telephone.  I believe information was faxed back to us.

. . .

Q.    Detective, based on that information what did you do with that information once you got it from Mr. Marrerro?

A.    I basically put it all together.  I proceeded to get the warrant together.  And I turned everything over to the fugitive squad.

---

[5]    This was approximately six months after the murders.

(Id. at 49:15–52:5.)[6]  Detective Centeno then testified that Petitioner was arrested in Las Vegas about a week after Marrero's statement, which was approximately six months after the murders. (Id. at 58:21–59:6.)

The final trial witness was Detective John Keen, from the fugitive unit, who testified that he had been given both Petitioner's name and the alias name "Christopher Arevalo" when he went out to Las Vegas to search for Petitioner.  Petitioner was ultimately arrested in Las Vegas approximately six months after the murders and transported back to Philadelphia.  (Id. at 68:23–72:11.)

During her closing, the prosecutor discussed Centeno's testimony regarding Petitioner's alleged flight to Las Vegas:

> All these incidents lead up to that March 7th date.  And then what does Mr. Klein do?  Don't you think they talk in Pemberton, in Browns Mills?  Don't you think they are all hanging out together?  He knows they are on to him.  He calls his buddy Melvin [Marerro].  Drive me to the train station, I'm taking a train to California.  It is 2004.  Who takes a train to California under a different name?  Christopher Arevalo.  Yeah, that's who I will be today when I get on that train to California.  Then when I go from California, I will take a bus to Las Vegas so maybe they can't find me.
>
> The Judge is going to instruct you on that.  He is going to tell you the importance of that.  That's flight.  Consciousness of guilt.  Flight from the scene when he ran, when he saw Dave Foster.  Consciousness of guilt.  He knows he did something wrong.  He knew exactly what he did.  The police were on to him by that point.

(N.T. 10/14/04, 78:16–79:13.)

During the charge to the jury, the trial court noted that the jury had "heard testimony about the fact that the defendant was arrested out of state in another state, and this evidence was brought

---

[6]  Defense counsel interposed several other objections during the course of this exchange, none of which had anything to do with the hearsay nature of Centeno's repetition of Marrero's out-of-court declaration.

forth." The trial judge continued with a standard flight instruction explaining that flight or concealment is a "circumstance that may tend to prove that the person is conscious of his own guilt." (N.T. 10/14/04, 93:1–21.)

## C. Procedural History

Petitioner filed a direct appeal to the Pennsylvania Superior Court alleging that the trial court erred in admitting hearsay testimony and that the evidence was insufficient to support the convictions. On November 15, 2006, the Superior Court affirmed the convictions and, thereafter, on April 30, 2007, the Pennsylvania Supreme Court denied allowance of appeal.

On May 15, 2007, Petitioner filed a *pro se* PCRA petition and was appointed counsel, who filed an amended PCRA petition. There, Petitioner alleged ineffective assistance of trial counsel for (a) failing to object to the hearsay testimony regarding flight and (b) failing to object to closing arguments and jury instructions regarding flight and consciousness of guilt. The PCRA court did not address the hearsay issue, finding only that the testimony in question was relevant as evidence of flight:

> It is well settled that when a person knows that he is wanted in connection with a criminal investigation, and flees or conceals himself, such conduct is relevant and admissible as evidence of consciousness of guilt. Commonwealth v. Hudson, 2008 Pa. Super, 955 A.2d 1031 (Pa. Super. 2008) citing Commonwealth v. Rios, 546 Pa. 271, 684 A.2d 546 (1996).
> . . .
> Detective Joseph Centeno testified that Marrero told him that he had taken Appellant to Philadelphia 30th Street Amtrak train station and that he traveled to the west coast using the alias Christopher Arevalo. . . . After investigating Amtrak records, Centeno obtained a warrant for [Petitioner] and [Petitioner] was later arrested in Las Vegas, Nevada. This evidence is admissible and relevant to show consciousness of guilt. Trial counsel will not be deemed ineffective for failing to pursue a meritless claim. Commonwealth v. Payne, supra. Error was not committed.

(Respondents' Opp'n Pet. for Habeas Corpus, Ex. B.)

Petitioner timely appealed to the Pennsylvania Superior Court raising several issues, including: (1) ineffective assistance of trial counsel for failing to present an alibi witness; (2) ineffective assistance of trial counsel for failing to object to the presentation of evidence concerning petitioner's flight and/or to the prosecutor's argument and the trial court's instruction concerning flight and consciousness of guilt; and (3) ineffective assistance of trial counsel for failing to object to the prosecutor's closing argument.[7] The Superior Court affirmed the dismissal of the PCRA petition on February 19, 2014.

With respect to the admission of Marrero's hearsay statement through Detective Centeno, the Pennsylvania Superior Court offered a different rationale from the PCRA court for admission of the hearsay evidence:

> "[C]ertain out-of-court statements offered to explain the course of police conduct are admissible on the basis that they are offered not for the truth of the matter asserted, but rather to show the information upon which the police acted." *Commonwealth v. Douglas*, 737 A.2d 1188, 1195 (Pa. 1999). Detective Centeno testified that as a result of receiving information from Marrero regarding Klein's planned departure to the West Coast and use of an alias, he obtained the itinerary of Klein's travel plans from the train station. Based on the itinerary, Detective Centeno obtained a warrant for Klein's arrest and turned the case over to the fugitive squad. Because the Detective's testimony was offered to show the course of conduct of the police in locating and apprehending Klein, it was admissible. Accordingly, trial counsel had no basis to object, and cannot be deemed ineffective. *See Commonwealth v. Rios*, 684 A.2d 1025, 1034 (Pa. 1996) (counsel cannot be found ineffective for failing to make meritless objections).

---

[7] Petitioner also raised the following claims: (1) ineffective assistance of trial counsel for failure to investigate or present witnesses from the neighborhood where the murders occurred; (2) ineffective assistance of trial counsel for failing to request a jury instruction on witness credibility and other crimes evidence; (3) ineffective assistance of trial counsel for failing to request a "corrupt source" jury instruction regarding David Foster and/or Melvin Marrero; (4) ineffective assistance of trial counsel for failing to object when the trial court's jury charge referenced only statements from Melvin Marrero and Ketkarun Boonsong, and not a witness statement from Catherine Johnson; and (5) the PCRA court erred in dismissing Petitioner's PCRA petition without an evidentiary hearing.

(Id., Ex. C.)

The Superior Court further rejected Petitioner's claims that trial counsel should have objected to the prosecutor's closing argument regarding consciousness of guilt. It found that the prosecutor was entitled to refer to the evidence and argue all reasonable inferences therefrom, and that the trial court had instructed the jury that arguments of counsel are not evidence. The Superior Court also did not find counsel ineffective for not objecting to the trial court's jury instruction regarding consciousness of guilt because "the evidence established that [Petitioner] fled the scene after the murders upon seeing Foster, solicited Marrero's help in driving him to 30th Street Station to take a train to the West Coast using an alias, and that he was later apprehended in Las Vegas by U.S. Marshalls [sic]." (Id.)

Petitioner filed a *pro se* Petition for Writ of Habeas Corpus on January 7, 2015, setting forth the following claims: (1) ineffective assistance of trial counsel for failing to object to "highly prejudicial evidence of flight and petitioner's use of an alias;" (2) ineffective assistance of trial counsel for failing to object to the prosecutor's comments regarding the use of an alias and flight in her summation and/or failing to request a limiting instruction from the trial court; (3) ineffective assistance of trial counsel for failing to object to Detective Centeno's testimony regarding flight and the use of an alias on the basis of an alleged discovery violation; (4) ineffective assistance of trial counsel for failing to present an alibi witness; (5) the admission of David Foster's hearsay testimony violated Petitioner's right to due process; (6) the evidence was insufficient to sustain the jury's guilty verdict and violated Petitioner's right to due process; and (7) ineffective assistance of trial counsel for failing to object to improper statements by the prosecutor during closing argument.

In a Report and Recommendation issued April 29, 2016, the federal Magistrate Judge found these issues either procedurally defaulted or meritless. As to the allegation regarding failure to call

an alibi witness, the Magistrate Judge found that Petitioner failed to demonstrate resulting prejudice. Regarding the introduction of Marrero's hearsay statement, the Magistrate Judge found that the claims were reasonably rejected by the state courts. Specifically, he noted that the state courts characterized the testimony as "course of conduct" evidence, which is not offered for the truth of the matter asserted, but rather to show why the police followed a certain course of conduct that led to the Defendant's arrest. The Magistrate Judge reasoned that because the testimony was not hearsay, the admission of these statements could not have violated Plaintiff's Sixth Amendment Confrontation Clause rights and could not be the basis of an ineffective assistance of counsel claim. (R&R 10–11.) He also concluded that trial counsel was not ineffective for failing to object to the prosecutor's closing because it was properly based on evidence of Petitioner's flight and because trial counsel conceivably had a strategic basis for not objecting. (Id. at 13.) Finally, the Magistrate Judge found that any claim regarding a failure to request a curative instruction was unexhausted and procedurally defaulted. (Id. at 13–14.)

On July 13, 2016, Petitioner filed *pro se* Objections to the R&R, to which Respondents submitted a brief in opposition on August 4, 2017. In an Order dated May 29, 2018, I appointed counsel to represent Petitioner in an evidentiary hearing regarding whether trial counsel had a reasonable strategy for not objecting to the admission of Marrero's out-of-court statement, not objecting to the prosecutor's use of the statement in closing arguments, and not seeking a limiting instruction regarding the use of Marrero's out-of-court statement. That evidentiary hearing took place on July 25, 2018, before the Magistrate Judge who submitted the Report and Recommendation referenced above.

## II.  STANDARDS OF REVIEW

### A.    Standard of Review of a Magistrate Judge's Report and Recommendation

Under 28 U.S.C. § 636(b)(1)(B), a district court judge may refer a habeas petition to a magistrate judge for proposed findings of fact and recommendations for disposition. When objections to a report and recommendation have been filed, the district court must make a *de novo* review of those portions of the report to which specific objections are made. 28 U.S.C. § 636(b)(1)(C); Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989). In performing this review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## B.    Standard for Federal Review of a Habeas Corpus Petition

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This is a "difficult to meet" and "highly deferential standard" for evaluating state-court rulings, which "demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (internal quotation marks and citation omitted).

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405–06 (2000). A decision is an "unreasonable application" of federal law if the state court identified the

correct governing legal rule but applied the rule to the facts of the case in an objectively unreasonable manner. Renico v. Lett, 559 U.S. 766, 773 (2010). A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. Miller–El v. Cockrell, 537 U.S. 322, 340 (2003).

A court's review of a state prisoner's habeas corpus petition follows a "prescribed path." Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013). First, it must determine what arguments or theories supported or could have supported the state court's decision. Id. Second, the court must ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." Id. (internal quotation marks omitted). Finally, habeas relief may be granted "only if the petitioner demonstrates that the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. at 846–47 (alterations omitted) (quoting Harrington v. Richter, 562 U.S. 86 (2011)).

## III.   LEGAL DISCUSSION OF PETITIONER'S OBJECTIONS

Petitioner sets forth four Objections to the R&R, all of which are couched as ineffective assistance of counsel claims pursuant to the Sixth Amendment of the Constitution.

The clearly established Supreme Court precedent governing ineffective assistance of counsel is the two-pronged standard enunciated by Strickland v. Washington, 466 U.S. 668 (1984) and its progeny. See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (acknowledging Strickland as the controlling authority). Under the first Strickland prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness

being judged under professional norms prevailing at the time counsel rendered assistance. Strickland, 466 U.S. at 688, 690.

Under the second Strickland prong, a petitioner must establish that "there is a reasonable probability that, but for counsel's error the result would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. To sustain a plausible ineffective assistance of counsel claim, a petitioner must show that the attorney's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. See Wells v. Petsock, 941 F.2d 253, 259–60 (3d Cir. 1991).

Notably, a court must apply a doubly deferential standard of review when analyzing an ineffective assistance of counsel claim under the federal habeas standard of § 2254(d)(1). Cullen v. Pinholster, 563 U.S. 170 (2011). "The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Harrington v. Richter, 562 U.S. 86, 101 (2011). In other words, when § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 105. When viewing a state court's determination that a Strickland claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." Id. at 101.

A.    **Ineffective Assistance of Counsel for Failure to Present the Alibi Testimony of Calvin Flowers**

Petitioner's first objection challenges the Magistrate Judge's conclusion that the state court correctly found no error in trial counsel's failure to present alibi testimony.

In the PCRA court, Petitioner argued that trial counsel was ineffective for failing to investigate and present Calvin Flowers as an alibi witness. Petitioner presented a signed, but un-notarized affidavit from Flowers stating that Petitioner was with Flowers in Irvington, New Jersey from 7:00 p.m. on March 6, 2004 until approximately 4:00 to 6:00 a.m. on March 7, 2004—a period of time that corresponded precisely with the murders. The affidavit also stated that after Petitioner's arrest, Flowers telephoned trial counsel, but counsel never contacted him. (Respondents' Opp'n Pet. Habeas Corpus, Ex. A, p. 9.) The PCRA court found that trial counsel was not ineffective for failing to produce this witness because, based on the substantial evidence presented a trial, there was no reasonable probability that the outcome of the trial would have been different. Id. at p. 10.

On review, the Pennsylvania Superior Court affirmed, noting that "a petitioner who asserts ineffectiveness for failing to call witnesses must provide affidavits from the alleged witnesses that indicate their availability and willingness to cooperate with the defense." Commonwealth v. Klein, 2013 WL 8695461 (Pa. Super. 2013). The Superior Court found that, in Petitioner's case, the trial court conducted a colloquy during which Petitioner voluntarily waived his right to call witnesses. Id. Moreover, Petitioner failed to plead and demonstrate that the alibi witness was prepared to cooperate, would have testified on his behalf, and would have been helpful to the defense. Id.

The Federal Magistrate Judge found no error in these holdings, reasoning that Petitioner could not demonstrate prejudice. He noted that the evidence at trial was substantial since two witnesses testified that Petitioner separately confessed the murders. In addition, the Magistrate Judge found that the evidence revealed that Petitioner had a motive to kill the victims based upon their having previously kidnapped and beaten Petitioner. (R&R 15.) The Magistrate Judge concluded that Petitioner could not show a reasonable probability that the outcome of his trial would have been different if only trial counsel had called Flowers as a witness.

Petitioner now argues that both the state court judges and the Magistrate Judge "substituted their own subjective assessment of the evidence, which Petitioner was never afforded the proper evidentiary hearing to present and develop, in concluding that the failure of trial counsel to call Calvin Flowers, who would have offered credible testimony placing Petitioner elsewhere with him when the homicides for which Petitioner was convicted occurred, would have not resulted in an acquittal." (Pet.'s Objections p. 10.) He argues that the proper standard, as set forth by the Third Circuit in Saranchak v. Sec'y, Pa. Dept. of Corrs., 802 F.3d 579 (3d Cir. 2015), requires only a showing that, but for counsel's unprofessional errors, the result of the proceeding would have been different as viewed from the perspective of "an unspecified, objective factfinder." Id. at 588. In contravention of that standard, Petitioner claims that a reasonable juror, if presented with Flowers's testimony, may have afforded more weight to the recantation testimony of the two key witnesses to Petitioner's confession and may have believed Flowers that Petitioner was with him at the time of the murder. Absent an evidentiary hearing to hear Flowers's testimony and review that testimony in light of the other evidence in the case, Petitioner contends that the state courts' and the Magistrate Judge's adjudication of this claim was based on an unreasonable determination of the facts and an unreasonable application of federal law.

Even assuming *arguendo* that Petitioner could, in fact, demonstrate prejudice from trial counsel's failure to call Mr. Flowers as an alibi witness, I find no error in the Pennsylvania Superior Court's determination that Petitioner had failed to establish that trial counsel's representation "fell below an objective standard of reasonableness as defined by prevailing professional norms." Saranchak, 802 F.3d at 588 (internal quotation marks omitted). To succeed on a claim of ineffective assistance based on the failure to call a witness, a defendant must prove:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence

of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. Failure to call a witness is not per se ineffective assistance of counsel, for such a decision implicates matters of trial strategy. It is Appellant's burden to demonstrate that trial counsel had no reasonable basis for declining to call [ ] a witness.

Figueroa v. Mooney, No. 14-2876, 2016 WL 4975211, at *6 (E.D. Pa. Aug. 18, 2016) (quoting

Commonwealth v. Washington, 927 A.2d 586, 599 (Pa. 2007)).

Petitioner could arguably establish several of these factors. In Mr. Flowers's un-notarized affidavit, attached to Petitioner's PCRA petition, Flowers avers that he "know[s] for a fact" that Petitioner could not have committed the murders because Petitioner was with him at "a couple of bars" from 7:00 p.m. March 6, 2002 until about 4:00 a.m. to 6:00 a.m. on March 7, 2002. (Flowers Aff. ¶ 4.) The Flowers affidavit goes on to state that after Petitioner was arrested, he (Flowers) "telephoned his [Petitioner's] attorney," but counsel "never contacted me, nor anybody else from the defense," and "I was available at the time of Mr. Klein's trial and would have been willing to testify to the information stated herein, if I had been called as a witness." (Id. ¶¶ 5–6.)

Petitioner's argument, however, fails to show the absence of a reasonable basis for not calling Flowers. As noted by the Pennsylvania Superior Court, at the close of the prosecution's case, Petitioner was carefully questioned by the trial judge during which he voluntarily waived the right to call witnesses. The following exchange occurred:

> Q: Are you satisfied with your attorney's representation of you?
> A: Yes, sir.
> Q. Has anybody promised you anything or threatened or gave you any inducements in order to get you not to testify?
> A. No, sir.
> Q. Do you have any witnesses that you wish to call?
> A. No, no, sir.
> MR. WALLACE [defense counsel]: Judge, other than character witnesses.
> THE COURT: Character witnesses.

THE DEFENDANT: Yes, character witnesses.

Q. Do you have any fact witnesses you wish to call?

A. No.

Q. Were there any witnesses that were never contacted by you or your attorney?

A. Not to my knowledge.

Q. Are there any questions that you wish to ask at this point?

A. No sir.

(N.T. 10/13/04, 76:9–77:9.)

If Petitioner was in fact with Flowers on the night of the murders, he of course would have been acutely aware of that fact. Yet, Petitioner clearly represented on the record that there were no witnesses that he wished to call and none that should have been contacted by him or his attorney. Having explicitly waived his right to call fact witnesses, Petitioner cannot now plausibly argue that counsel had no reasonable basis for failing to call an alibi witness. As such, I will overrule Petitioner's objection on this issue.

**B.      Ineffective Assistance of Counsel for Failure to Raise a Sixth Amendment Objection to Hearsay Testimony and Subsequent Failure to Object to Use of This Testimony in Closing and During Jury Instructions**

Petitioner's remaining Objections are interrelated and challenge (a) trial counsel's failure to object to the admission of hearsay testimony regarding Petitioner's alleged flight out of state under an alias after the murders, thereby resulting in a violation of Petitioner's Sixth Amendment Confrontation Clause rights; (b) trial counsel's subsequent failure to object to the prosecutor's use of this evidence in her closing argument; and (c) trial counsel's failure to request a limiting instruction regarding the proper use of the alleged hearsay testimony. As these three Objections share a common factual backdrop, I will discuss them jointly under the <u>Strickland</u> standard.[8]

---

[8]      Respondent argues that Petitioner's Confrontation Clause claims may be procedurally defaulted because, although he raised ineffectiveness of counsel claims to the PCRA court and Pennsylvania Superior Court, he did not couch them as <u>Crawford</u> violations. Under Pennsylvania law, claims of trial counsel ineffectiveness are waived if not raised on PCRA review.

1. **Whether Counsel's Performance Fell Below an Objective Standard of Reasonableness**

As noted above, the initial prong of Strickland asks whether counsel's performance was so deficient that it fell below an "objective standard of reasonableness" under "professional norms prevailing at the time counsel rendered assistance." Strickland, 466 U.S. at 688, 690. This prong, in turn, involves two further inquiries. First, because "[t]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument," a court must look into the substantive merit of the alleged failure. United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999); United States v. Vas, 255 F. Supp. 3d 598, 603 (E.D. Pa. 2017). Second, if the argument that was not raised by counsel has merit, the court "must indulge a strong presumption

---

Commonwealth v. Grant, 813 A.2d 726, 738 (Pa. 2002). In turn, such waiver results in a procedural default for purposes of federal habeas review. See Lines v. Larkins, 208 F.3d 153, 159–60 (3d Cir. 2000) ("[C]laims deemed exhausted because of a state procedural bar are procedurally defaulted.")

Such procedural default, however, may be excused under Martinez v. Ryan, 566 U.S. 1 (2012), which states that "where state law requires a prisoner to raise claims of ineffective assistance of trial counsel in a collateral proceeding, rather than on direct review, a procedural default of those claims will not bar their review by a federal habeas court if three conditions are met: (a) the default was caused by ineffective assistance of post-conviction counsel or the absence of counsel (b) in the initial-review collateral proceeding (i.e., the first collateral proceeding in which the claim could be heard) and (c) the underlying claim of trial counsel ineffectiveness is 'substantial[.]'" Cox v. Horn, 757 F.3d 113, 119 (3d Cir. 2014) (quoting Martinez v. Ryan, 566 U.S. 1, 14 (2012)).

All of these elements are present here. The first element is demonstrated by PCRA counsel's unequivocal testimony at the evidentiary hearing before the Magistrate Judge that she had no strategic reason for not raising Petitioner's claims as Confrontation Clause violations. (N.T. 8/15/18, 44:21–46:8.) For purposes of the second requirement, it is sufficient that I find that the procedural default of Petitioner's ineffectiveness claims was caused by PCRA's counsel's failure to raise the ineffectiveness claims before the state court on collateral review. See Preston v. Superintendent Graterford SCI, 902 F.3d 365, 377 (3d Cir. 2018). The final requirement is met if "'reasonable jurists could debate' that [Petitioner's] [ineffectiveness] claim[s] ha[ve] merit, or whether the claim is 'adequate to deserve encouragement to proceed further.'" Id. (quoting Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (further quotations omitted)). For the reasons set forth below, I find that Petitioner's defaulted claims are substantial and warrant further discussion. Accordingly, I find that PCRA counsel's ineffectiveness provides cause to excuse any procedural default on Petitioner's underlying trial counsel ineffectiveness claims.

that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689.

a.  Substantive Merit of Counsel's Failure to Object to Hearsay Testimony

Petitioner's ineffectiveness claims primarily rest on the admission of Melvin Marrero's out-of-court statement about Petitioner's flight and use of an alias, and trial counsel's failure to object to that testimony, issues which implicate the Confrontation Clause of the Sixth Amendment.[9]  In Crawford v. Washington, 541 U.S. 36 (2004), a case decided prior to Petitioner's trial, the United States Supreme Court held that the Sixth Amendment's Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant has had a prior opportunity for cross-examination." Id. at 53–54; see also Davis v. Washington, 547 U.S. 813, 822 (2006).  There are two necessary conditions to identify whether an out-of-court statement implicates the protection of the Confrontation Clause:  (1) the statement must be testimonial and (2) the statement must be introduced for its truth.  Lamberton v. Warden-Greene SCI, 861 F.3d 459, 469 (3d Cir. 2017).

Consequently, under Crawford, I must now determine whether Marrero's out-of-court statement satisfies both of the enumerated preconditions.  Thereafter, if I find that both preconditions have been met, I must consider whether Marrero was subject to sufficient confrontation so as to satisfy the Sixth Amendment.

_____

[9]    A mere error of state evidentiary law is insufficient to entitle Petitioner to federal habeas relief. Federal courts reviewing habeas claims cannot "reexamine state court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991).  Where an ineffectiveness claim rests purely on an argument trial counsel failed to object to a state law ruling, a habeas petitioner "cannot overcome the 'strong presumption' that his counsel's conduct fell outside the 'wide range of reasonable professional assistance.'" Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004).

### i.     *Whether Marrero's Statement Was Testimonial*

The Supreme Court defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact . . . . An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Crawford, 541 U.S. at 51 (citations and internal quotation marks omitted). The protections of the Confrontation Clause apply only to testimonial statements. U.S. v. Figueroa, 729 F.3d 267, 276 n.14 (3d Cir. 2013). "*Ex parte* examinations and interrogations used as a functional equivalent for in-court testimony are the 'core class of "testimonial" statements' that directly implicate the right of confrontation." Lambert v. Warden Greene SCI, 861 F.3d 459, 469–70 (3d Cir. 2017). The Supreme Court has held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 541 U.S. at 68.

Here, the trial record establishes that Marrero's statement was testimonial in that it was given during the course of a police interrogation. No state court has disagreed with that fact. As Marrero's statement falls within the "core class of testimonial statements," the Confrontation Clause is implicated.

### ii.     *Whether Marrero's Statement Was Admitted for Its Truth*

Once a statement is deemed testimonial, the next step is to determine whether the prosecution used the statement for the truth to establish the elements required to convict. Lambert, 861 F.3d at 470. "In making this determination, we are not to accept the prosecution's 'not-for-truth' rationale at face value, but instead must determine if there is a '*legitimate*, non hearsay purpose' . . . by 'thoroughly examin[ing] the use of the out-of court [statements] and the efficacy of a limiting instruction.'" Id. (quoting Williams v. Illinois, 567 U.S. 50, 105–06 (2012)) (further

quotations omitted).  The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  Crawford, 541 U.S. at 59 n.9.

As explained above, here the PCRA court sidestepped the hearsay issue and found that Marrero's out-of-court statements were relevant to the issue of flight, which according to the prosecution's theory, was relevant to Petitioner's consciousness of guilt.  But the PCRA court ignored the inherent evidentiary problems as to how this evidence was admitted.

The Pennsylvania Superior Court went a different direction and concluded that Marrero's out-of-court statements were not offered for the truth, but were admissible to show police "course of conduct."  In doing so, it noted that, under Pennsylvania evidentiary law, an out-of-court statement offered to explain a course of conduct is not hearsay and, thus, does not implicate the Confrontation Clause.  See e.g., Commonwealth v. Chmiel, 889 A.2d 501 (Pa. 2005); Commonwealth v. Hardy, 918 A.2d 766 (Pa. Super.  Ct. 2007).  "'Course of conduct' narratives often include out-of-court statements that are not offered for the truth of the matter asserted therein; frequently, the statements are also non-essential to the prosecution's case, or the declarant testifies at trial, or the defendant opened the door to the admission of the evidence, or the admission of the statements was deemed harmless error."  Commonwealth v. Dent, 837 A.2d 571, 581 (Pa. Super. Ct. 2003) (citations omitted).

Well before the trial in this matter, however, the use of the course-of-conduct exception to the hearsay rule came under scrutiny by both state and federal courts, which noted a need to balance the relevance of this type of testimony with the constitutional guarantees of the Sixth Amendment. In Commonwealth v. Palsa, 555 A.2d 808 (Pa. 1989), the Pennsylvania Supreme Court recognized that although "certain out-of-court statements offered to explain a course of police conduct are admissible" as non-hearsay, "it cannot be said that *every* out-of-court statement having bearing upon

subsequent police conduct is to be admitted, for there is a great risk that, despite cautionary jury instructions, certain types of statements will be considered by the jury as substantive evidence of guilt." Id. at 810 (emphasis in original). Given that risk, the Court stated that "the police conduct rule does not open the door to unbounded admission of testimony, for such would nullify an accused's right to cross-examine and confront the witnesses against him." Id. It reasoned that although an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene . . . [h]is testimony that he acted 'upon information received,' or words to that effect, should be sufficient . . . . The need for the evidence is slight, the likelihood of misuse great." Id. at 810–11 (quoting McCormick On Evidence § 249, at 104).[10]

The United States Court of Appeals for the Third Circuit has also expressed similar concerns with the admission of course-of-conduct testimony for the truth of the matter asserted. In United States v. Sallins, 993 F.2d 344 (3d Cir. 1993), the issue was whether the trial court erred in admitting evidence of a police radio dispatch and a police computer record detailing the contents of a call to 911. Id. at 345. At trial, the officer testified that he and his partner received police radio dispatch

---

[10] The Pennsylvania Superior Court applied Palsa's principles to a claim of ineffective assistance of counsel for failure to raise and preserve an objection to "course of conduct" testimony. In Commonwealth v. Thomas, 578 A.2d 422 (Pa. Super. Ct. 1990), the Court considered "whether prior counsel provided ineffective assistance in failing to raise and preserve an objection to a portion of police 'course of conduct' hearsay testimony which indicated a third party who did not testify at trial, knew appellant, was present when the offense occurred, and identified appellant as the perpetrator." Id. at 423. The Court noted that the fact that the auto theft crime at issue had been committed was not in question; rather the sole issue at trial was one of identity. Id. It remarked that "[w]hile it may have been necessary to explain to the jury why the police arrested appellant and not someone else," the introduction of a statement by Dale Harris—a man who knew the appellant and was present at the scene, but did not testify—identifying appellant as the perpetrator was offered to "provide proof of appellant's guilt through a person not under oath, nor available for cross-examination." Id. at 428. The Court determined that "[n]o plausible tactical basis *could* exist for the waiver of such a challenge by counsel," and observed that "while we in no way suggest that the evidence against appellant was insufficient to sustain the verdict"—particularly given the identification of appellant by the victim—without the improper evidence, the jury "might very well have found reasonable doubt in this case." Id.

prompting him to look for a black male with all black clothing carrying a gun in a certain area. Id. The government argued that the contents of the radio call were introduced only course of conduct. Id. at 345–46. On appeal, the Third Circuit recognized that "[i]f the hearsay rule is to have any force, courts cannot accept without scrutiny an offering party's representation that an out-of-court statement is being introduced for a material non-hearsay purpose. Rather, courts have a responsibility to assess independently whether the ostensible non-hearsay purpose is valid." Id. at 346. The court concluded that because the details of the radio call were offered for their truth value and were used for the truth in the prosecutor's closing argument, the testimony was hearsay and should have been excluded. [11] Id. at 347.

The facts before me are substantially analogous to the foregoing cases.[12] The state court record reveals that Marrero's out-of-court statement—that he drove Petitioner to the train station

---

[11]     Respondents argue that Petitioner's reliance on Sallins is misplaced because: (a) it was a federal case heard on appeal, not a habeas matter, and thus had a different standard of review, and (b) it is a Third Circuit decision that cannot serve as binding legal authority in the habeas context, which considers only whether a state court decision is contrary to or an unreasonable application of federal law. I agree that the well-established federal law at issue is not Sallins, but rather Strickland v. Washington, which requires a determination of whether counsel's performance fell below an objective standard of reasonableness as established by prevailing norms. The ruling in Sallins simply echoes the holding and rationale of the Pennsylvania Supreme Court in Palsa that hearsay statements may not be admitted under the guise of course of conduct testimony when, in fact, the statements are substantively used for their truth. To the extent that a witness's statement is wrongly characterized by a trial court as course-of-conduct testimony when it is actually admitted for the truth of the matter asserted, a state court's conclusion that counsel was not ineffective for failing to object—without a concurrent finding that counsel was acting under a reasonable strategy—would be an unreasonable application of federal law.

[12]     Respondents also contend that "Sallins is highly fact-specific and its holding is not extendable to the instant matter, where Melvin Marrero's information concerning petitioner's intentions and alias were not used as substantive evidence, but were necessary to explain why police apprehended a 'Christopher Arevalo' in Las Vegas." (Resps.' Opp'n to Objections p. 9.)
         This argument is mistaken on three points. First, contrary to Respondents' argument, the record clearly shows that the prosecutor used Marrero's statement as substantive evidence, not as course-of-conduct evidence. Second, as discussed in more detail, the record does not contain any clear indication that a "Christopher Arevalo" was apprehended in Las Vegas. Finally, the basic

where Petitioner intended to board a train for the west coast under an alias—was not, as the Pennsylvania Superior Court suggested, offered to explain Centeno's course of conduct, but rather was used for the truth of the matter asserted. Detective Centeno's reason for notifying the fugitive squad to look for a Christopher Arevalo in Las Vegas was not at issue in the case and did not advance the ultimate question of whether Petitioner had committed the murders. To the extent course of conduct information was necessary, Centeno could have simply explained that six months after the murders he received information that Petitioner was in Las Vegas. By including the additional hearsay information that Marrero told him that he drove Petitioner to the train station so that Petitioner could leave town using an assumed name, the prosecution introduced evidence that Petitioner had fled under an alias to avoid apprehension. Trial counsel offered no ongoing objection to the hearsay nature of this testimony, failed to request that the testimony be limited to explaining the actual course of conduct by the police, and failed to request that incriminating statements testified to by Centeno be stricken.

Compounding the error, the prosecutor directly referenced Marrero's statement, arguing that Petitioner "call[ed] his buddy Melvin. Drive me to the train station, I'm taking a train to California. . . . Christopher Arevalo. Yeah, that's who I will be today when I get on that train to California . . . . That's flight. Consciousness of guilt. . . . He knows he did something wrong." (N.T. 10/14/04, 78:16–79:13.) Trial counsel did not object that such argument was inappropriate, and did not request that the trial court give any limiting or curative instruction to explain to the jury that Marrero's statement was only to be considered for establishing course of conduct.

---

principle of <u>Sallins</u>—that courts cannot accept without scrutiny an offering party's representation that an out-of-court statement is being introduced to show course of conduct—is not "highly fact-specific" and is clearly applicable to any case where hearsay testimony is purportedly introduced to explain police course of conduct. The holdings of <u>Sallins</u> and <u>Palsa</u> have repeatedly been applied in other cases with similar, but not identical facts.

In light of this record, I find that Marrero's out-of-court statement was admitted for its truth and, due to its testimonial nature, clearly implicated constitutional concerns. The Superior Court's contrary finding—that any objection by counsel would have been meritless—constitutes an unreasonable application of federal law as set forth in <u>Strickland</u>. As such, for purposes of the Confrontation Clause, I find that <u>Crawford</u>'s second condition has been satisfied.

<em>iii.      Whether Petitioner Had an Opportunity for Confrontation</em>

Having determined that Marrero's statement was testimonial and admitted for its truth, I now consider whether Petitioner's Confrontation Clause rights were satisfied by Marrero's testimony and presence on the witness stand at trial. I find that resolution of this issue is, at best, unclear.

In <u>Crawford</u>, the Supreme Court "changed the legal landscape for determining whether the admission of . . . hearsay statements violates the accused's right[s] under the Confrontation Clause." <u>U.S. v. Hendricks</u>, 395 F.3d 173, 177 (3d Cir. 2005) (quotations omitted). In that case, the state charged the defendant with assault and attempted murder for stabbing a man the defendant believed had tried to rape his wife. <u>Crawford</u>, 541 U.S. at 38. During the investigation, both the defendant and his wife gave formal statements to law enforcement officials. <u>Id.</u> at 38–39. Although the wife generally corroborated her husband's version of the events leading up to the fight, her account of the fight was different than that of her husband as to whether the victim had drawn a weapon before the defendant struck him. <u>Id.</u> at 39–40. At trial, the defendant claimed self-defense, and, pursuant to the marital privilege under state law, the wife was unavailable to testify. <u>Id.</u> at 40. The prosecution sought to admit the wife's statements to police through a hearsay exception, while the defendant contended that the admission of the statements would violate the Confrontation Clause. <u>Id.</u> The trial court allowed the wife's statements to be admitted, but the United States Supreme

Court subsequently reversed, holding that "testimonial" hearsay statements may not be introduced against a defendant unless the declarant is unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant, regardless of whether the statement fell within a firmly rooted hearsay exception or had a particular guarantee of trustworthiness.  Id. at 59.  The Supreme Court went on to clarify that "[t]he Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."  Id. at 59 n.9.  Finding that the wife's statements given to the police officers were "testimonial" and that, due to the marital privilege, the defendant had no opportunity to cross-examine her, the Court held that the trial court's admission of the wife's statements to the police as evidence against the defendant violated his rights under the Sixth Amendment.  Id. at 68–69.

The United States Court of Appeals for the Third Circuit offered further guidance on Crawford's scope in the recent case of Preston v. Superintendent Graterford SCI, 902 F.3d 365 (3d Cir. 2018).  In Preston, the defendant and his brother Leonard were charged with a murder.  Id. at 369.  At Leonard's trial, Leonard took the stand in his own defense and, consistent with a statement given to police after arrest, explained the circumstances of the crime, which implicated the defendant in the shooting.  Id.  During the defendant's subsequent trial, the Commonwealth called Leonard as a witness, but he asserted his Fifth Amendment privilege against self-incrimination and refused to testify.  Id. at 370.  The Commonwealth sought and was granted leave to introduce Leonard's prior statements, and defense counsel did not interpose any Sixth Amendment objection.  Id. at 371.  On review, the Third Circuit held that "[a] criminal defendant's right to cross-examination is not satisfied simply because a witness appears and takes the stand at the defendant's trial.  A criminal defendant is also entitled to a '*full and fair opportunity* to probe and expose the[] infirmities' of the witness's testimony."   Id. at 380 (quoting Delaware v. Fensterer, 474 U.S. 15,

22 (1985)) (emphasis in original). The Third Circuit determined that the defendant did not have a full and fair opportunity to expose the infirmities of Leonard's statements through meaningful and effective cross-examination because Leonard refused to answer almost every question defense counsel asked him. Id. at 380–81. The Court concluded that although "[i]t is possible that, in some circumstances, a witness's answers on direct examination may provide the jury with enough information to reach a credibility determination and therefore satisfy the Confrontation Clause[,] . . . neither direct examination nor a creative closing argument was a substitute for cross-examination in [that] case." Id. at 382.

The facts before me do not lend themselves to a straightforward analysis of the Confrontation Clause issue. Unlike the witness in Crawford, Marrero appeared as a witness and testified. And unlike the witness in Preston, Marrero answered questions about the flight and alias issues. While Marrero denied telling police about taking Petitioner to the train and the alias, he did not invoke any privilege to avoid answering questions.

The first mention of Petitioner's presence in Las Vegas arose during Marrero's cross-examination when defense counsel elicited brief testimony that sometime after the murders, Petitioner left town to do some work with the Wu Tang Clan. (N.T. 10/12/04, 111:6–12.) Thereafter, during re-direct examination, the prosecutor asked Marrero whether he had driven Petitioner to 30th Street Station, at some unspecified point in time, so he could take a train to California and a bus to Las Vegas. As noted above, the specific testimony on re-direct examination was:

> Q.  Mr. Wallace asked, you said the defendant left town. You took him to 30th Street Station, didn't you?
> A.  No, ma'am.
> Q.  You didn't?
> A.  No.

| Q. | You didn't take him to 30th Street Station so he could take a train to California and a bus to Las Vegas? |
|---|---|
| A. | No. |
| Q. | You didn't do that? |
| A. | No, ma'am. |
| Q. | Do you know the name Christopher Arevalo? |
| A. | No. |
| Q. | Not familiar with that name? |
| | . . . |
| A. | Who is that, by the chance? I don't—you keep asking me that. I don't even really understand who that is. Never even heard of that name. |
| Q. | Did the defendant ever use that name? |
| A. | I don't know. I don't believe so. |

(N.T. 10/12/04, 114:20–115:20.)

The following day, Detective Centeno took the stand and, through his testimony, the prosecutor introduced the flight and alibi evidence derived from Marrero's prior out-of-court statement. Although defense counsel had no opportunity thereafter to specifically confront Marrero about this out-of-court statement, defense counsel did have ample opportunity, the day prior, to delve into the precise subject matter, *i.e.* whether Marrero had driven Petitioner to the train station. Marrero explicitly denied doing so. Thus, unlike the witnesses in both <u>Crawford</u> and <u>Preston</u>, the jury had the opportunity to observe Marrero's demeanor and credibility on the issue of the alleged flight to California. It is unlikely that additional confrontation as to the prior statement would have yielded greater results. But, because Marrero was a recanting witness, it is unclear whether a "full and fair opportunity to probe and expose the infirmities" of his testimony was accomplished.

And although defense counsel was able to confront Marrero about the underlying substance of his out-of-court statement, he did not have a clear opportunity to require that Marrero confirm or deny, in front of the jury, whether he made the prior out-of-court statement. Moreover, although Marrero was questioned generally on redirect about whether he had heard the name Christopher Arevalo, defense counsel did not clearly have an opportunity to test Marrero's out-of-court

statement that Petitioner used an alias to flee to California. Finally, the trial record does not provide sufficient information regarding whether Marrero was "unavailable," such that he could not be brought back to the courtroom for additional cross-examination. A finding of unavailability requires that "the prosecutorial authorities have made a good-faith effort to obtain [the witness's] presence at trial." Barber v. Page, 390 U.S. 719, 725 (1968).

In short, the state court record establishes that the declarant did appear and was questioned about the hearsay testimony that was later introduced through Detective Centano. As far as I can tell, the precedential landscape of Confrontation Clause cases does not clearly address the unusual circumstances at issue here. If my decision on the Petition before me depended on making the determination as to whether Petitioner's Confrontation Clause rights were violated, I would reluctantly conclude that such violation had occurred because meaningful confrontation was not accomplished. But, I need not affirmatively decide this issue because, as set forth below, I find that relief is not appropriate as Petitioner has failed to prove resulting prejudice. Therefore, for the sole purpose of including a comprehensive discussion of the issues before me, I will proceed under the notion that Petitioner's right of confrontation was denied and that, under prevailing professional norms, trial counsel had a duty to object to the admission of the flight and alias testimony.

2.      Whether Counsel Had Any Possible Sound Trial Strategy

Assuming *arguendo* that the missed objections to the hearsay testimony could conceivably rise to the level of a Confrontation Clause violation, I must next consider whether counsel had any possible sound strategy for failing to object. Under Strickland, counsel is presumed to be operating under sound legal strategy, even if not the most effective strategy. The United States Supreme Court, defining the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments, has held:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690–91; see also Wiggins v. Smith, 539 U.S. 510, 521–22 (2003).

A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quotations omitted). To overcome that presumption, "a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005). This test tasks the district court with assessing "counsel's reasonableness . . . on the facts of the particular case, viewed as of the time of counsel's conduct." Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005).

Elaborating on Strickland's standard, the Third Circuit has defined a "tiered structure" with respect to the strategic presumptions:

> At first, the presumption is that counsel's conduct might have been part of a sound strategy. The defendant can rebut this "weak" presumption by showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound. . . . In cases in which the record does not explicitly disclose trial counsel's actual strategy or lack thereof (either due to lack of diligence on the part of the petitioner or due to the unavailability of counsel), the presumption may only be rebutted through a showing that no sound strategy posited by the Commonwealth could have supported the conduct . . . However, if the Commonwealth can show that counsel actually pursued an *informed* strategy (one decided upon after a thorough investigation of the relevant law and facts), the "weak" presumption becomes a "strong" presumption, which is "virtually unchallengeable."

Thomas, 428 F.3d at 499–500 (footnotes and internal citations omitted). "Courts have routinely declared assistance ineffective when 'the record reveals that counsel failed to make a crucial objection or to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles.'" Id. at 501 (quoting 3 Wayne LaFave et al., Criminal Procedure § 11.10(c), at 721 (2d ed. 1999)); see also Cofske v. United States, 290 F.3d 437, 443 (1st Cir. 2002) ("[C]ourts tend to be somewhat less forgiving where counsel altogether overlooks a possible objection or opportunity.") (citing LaFave, supra, § 11.10(c), at 714-15). "[T]he defendant is most likely to establish incompetency where counsel's alleged errors of omission or commission are attributable to a lack of diligence rather than an exercise of judgment." Thomas, 428 F.3d at 501 (quoting LaFave, supra, § 11.10(c), at 714).

In their review of this issue, the state courts here did not mention strategy, let alone hold an evidentiary hearing to identify any possible tactical purpose underlying counsel's alleged failures to object. Absent any state court findings to which I can defer, I consider the issue of strategy *de novo*. Thomas, 428 F.3d at 501; see generally 28 U.S.C. § 2254(e)(1).

On July 25, 2018, a federal Magistrate Judge held an evidentiary hearing on the sole issue of whether trial counsel had a reasonable strategy for (a) not objecting to the admission of Marrero's out-of-court statement; (b) not objecting to the prosecutor's use of the statement in closing arguments; and (c) not seeking a limiting instruction regarding the use of Marrero's out-of-court statement. The testimony offered at that hearing now informs my analysis of this prong of Strickland.

On the first issue of counsel's failure to object to the admission of Marrero's out-of-court statement on confrontation clause grounds, trial counsel conceded that he was not operating under any strategy:

Q.      At that point, the prosecutor asked Detective Centeno, "Did Mr. Marrero tell you that the defendant had left town?"  Do you see that question?

A.      Yes.

Q.      And did you have a strategic reason for not raising a hearsay objection to that question?

A.      Not at that point.

Q.      And did you have a strategic reason for not also bringing a confrontation clause objection.

A.      Not at that point, no.

Q.      Immediately following that question, on line 18, the prosecutor asked, "What did he tell you about that?"  Did you have a strategic reason for not bringing a hearsay objection to that question?
. . .

A.      No.

Q.      And did you have a strategic reason for not bringing a confrontation clause objection?

A.      No.
. . .

Q.      "[T]he last question was, "What name was that?"  Have you had a chance to look at—

A.      Yes.

Q.      . . . those questions?

A.      Yes.

Q.      Did you have a strategic reason for not bringing a hearsay objection to those questions?

A.      No.

Q.      And did you have a strategic reason for not bringing a confrontation clause objection?

> A. No.

(N.T. 8/15/18, 12:16–14:6.) In short, trial counsel admitted that he had no strategy for failing to raise an objection—either as hearsay or under the Confrontation Clause—to the admission of Marrero's out-of-court statement. As such, I find that counsel was ineffective for failing to raise the objection.

With respect to the failure to object to the use of this testimony in the prosecution's closing argument, trial counsel articulated some basis for his inaction:

> Q. And did you have a strategic reason for not objecting to the prosecutor's use of Detective Centeno's testimony during this portion of the closing?
>
> A. I did—I do now and I did then.
>
> Q. Go ahead.
>
> A. Those questions, both before and after, involving Detective Centeno and this part of her closing, at the time, my estimation it was brought in for purposes of consciousness of guilty, which she reaffirms . . . My overall viewpoint was that this was—this had nothing to do with consciousness of guilt and, in fact, affirmed an idea or concept that I had in my mind that I tried to get across to the jury, that my client, Mr. Klein, was a—in the music business up to his eyes and this had—this had—you have to understand two things. We're looking at something that's taken somewhat out of context. The consciousness of guilt argument, and I'm not going to argue the law, but generally it's an occurrence in and around the time of an incident or with knowledge of a warrant being presented. This didn't even come close to being a consciousness of guilt argument, which is how I was interpreting what she was saying. He didn't leave town, as far as I recall, until September, which was about six months after the incident, not running from the scene of the crime or getting a plane out of town two days after a homicide. He was around for a long time. He was pursuing something that I knew and that I think I brought out in the—in other testimony, a musical career. To me, and this may be the wrong word, but it was almost inane that you could make an argument of

consciousness of guilt, which she may have had a—the district attorney may have had a different reason for, in her mind, but she connects it with consciousness of guilt in this particular paragraph. I didn't object because I just thought it was so inane that it wasn't being validated, and the fact that she said it almost at the end of her closing, I think it's one of those throw-in items. And that's what my mindset was. So did I have a strategic reason? Yeah, but it goes all the way back to cross examination of other people and other witnesses' testimony.

Q. To the extent that you thought this was—to the extent that you thought this was inane, wouldn't it have been incumbent upon you for making sure that the jury did not take this evidence for its truth?

A. Yes.

Q. And in retrospect, do you understand how the jury may have interpreted this evidence at the time of trial?

A. The only way I can answer that, it's conceivable a juror can interpret evidence any way he wants, I mean, it's a magical kingdom we're not into. Should I have objected? Probably.

Q. And why do you say that?

A. Well the district attorney sort of put it in for one reason that I was thinking of, consciousness of guilt, which I didn't really object to because that's what I thought was inane, the fact that she would argue consciousness of guilt with someone leaving town six and a half months after a crime is committed. She may, in fact, have put it in there for the reason of proving a fact, that he did leave, he did use an alias. That's not where my headset was. And I can't explain it any better than that.

(N.T. 8/15/18, 14:24–17:9.)

Trial counsel's testimony addresses only his reasons for not objecting to the flight evidence, but offers no explanation as to why he sat silent and allowed evidence of an alias to be admitted through hearsay. The Pennsylvania Supreme Court has held that "[w]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of

consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred." Commonwealth v. Rios, 546 Pa. 271, 684 A.2d 1025, 1035 (Pa. 1996) (emphasis added) (quotations omitted). As such, to be admissible, the flight need not occur immediately after the crime. Com. v. Downer, 49 A.2d 516, 520 (Pa. Super. Ct. 1946) (citing Commonwealth v. Liebowitz, 17 A.2d 719, 723 (Pa. Super. 1941)). The Pennsylvania Superior Court has further recognized that evidence of use of an alias is an even stronger indicator of guilt and, thus, its admissibility as to consciousness of guilt does not depend on any showing that the defendant know he is wanted. Commonwealth v. Harris, 386 A.2d 108, 111 (Pa. Super. Ct. 1978).

Here, it is true that the flight at issue took place six months after the murders. But a time delay between the crime and flight can still manifest consciousness of guilt. See Commonwealth v. Custis, No. 3323 EDA 2014, 2016 WL 2349066, at *4 (Pa. Super. Ct. May 4, 2016) (holding that where warrant was issued for the defendant's arrest five months after the shooting and defendant was not arrested until over a year after the shooting, circumstantial evidence was sufficient to support a flight instruction, even absent direct evidence that defendant actually knew he was being sought by police); Commonwealth v. Whack, 393 A.2d 417, 420 (Pa. 1978) (holding that where the defendant was seen running from the scene of a stabbing, and was not seen again at his home or the places he usually frequented for approximately two months, there was sufficient evidence to establish a reasonable inference that the defendant had deliberately attempted to conceal his whereabouts to avoid prosecution).

Moreover, even if I were to accept trial counsel's reasoning that, given the six-month delay between the crime and flight, he did not have to object, I cannot ignore the fact that he also sat silent as the evidence of an alias was introduced. "Any objective standard of reasonableness requires counsel to understand facts and testimony and adapt to them, even at the expense of purportedly

clever theories." Workman v. Superintendent Albion SCI, App. No. 16-1969 (3d Cir., filed Feb. 12, 2019). Trial counsel's lack of strategy regarding the alias is also underscored by his subsequent failure to object to the trial court's instruction on flight.

Given all of the above, Petitioner has adequately established that trial counsel's actions (or lack thereof) were not part of a sound strategy. Assessing counsel's reasonableness on the facts of the case viewed at the time of counsel's conduct, I find that even a cursory investigation into Pennsylvania law would have revealed that (a) the hearsay testimony regarding Petitioner's flight and use of an alias was improperly admitted; (b) the prosecutor directly took advantage of admission of this evidence in her closing, arguing that Petitioner's flight and alias constituted evidence of consciousness of guilt; and (c) had this evidence been properly excluded, the trial court would not have given a flight instruction. As such, I find that trial counsel posited no possible sound strategy that could have supported the challenged conduct.

### 2.     Whether Counsel's Error Resulted in Prejudice

The habeas inquiry does not end at this juncture. Rather, to succeed on his habeas petition, Petitioner must show a reasonable probability that but for counsel's error, the result would have been different. Strickland, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. "The prejudice standard 'is not a stringent one' and is 'less demanding than the preponderance standard.'" Bey v. Superintendent Greene SCI, 856 F.3d 230, 242 (3d Cir. 2017) (quotations omitted). "However, a petitioner must show 'not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Id. (emphasis in original) (quotations omitted).

"In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." Harrington v. Richter, 562 U.S. 86, 111 (2011). "Instead, Strickland asks whether it is 'reasonably likely' the result would have been different." Id. Notably, this "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Id. at 111–12. The likelihood of a different result must be substantial, not just conceivable. Id. at 112.

"It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999). "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Id. at 695. As the Supreme Court remarked, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696.

Engaging in the prejudice analysis *de novo*, I find that the trial record does not clearly establish prejudice under the second Strickland prong. My careful review of the evidence presented does not lead me to the conclusion that, but for counsel's errors, the likelihood of a different result was substantial.

The totality of the trial court record, without the flight and alias testimony, certainly contained sufficient evidence to support the verdict. First, Petitioner's motive to commit the crimes was compelling. Through the prior statements of Melvin Marrero and Ketkarun Boonsong, the prosecutor established that the victims had kidnapped Petitioner, tied him up, and beat him—all

close in time to the murders—thereby giving him incentive for revenge. (N.T. 10/12/04, 81:17–20 173:17–22, 208:22–29.)

Second, both Marrero and Boonsong's signed statements to police contained explicit confessions to the murders by Petitioner. Marrero's statement contained details of the crime as relayed to him by Petitioner, including the type of gun used. Although both men recanted their statements, they offered unsubstantiated explanations for why they would falsely implicate Petitioner.[13] Moreover, their recantations were substantially undermined because: (i) both individuals signed each page of their statements; (ii) Boonsong had appeared in court in December 2002, after his original statement, and provided testimony identical to that in his statement; and (iii) Detectives Cummings and Egenlauf—the two officers who took the statements from Marrero and Boonsong—unequivocally testified that the statements were accurate and knowingly and voluntarily given. (Id.)

Third, compelling evidence of guilt was introduced through witness David Foster, who established that Petitioner was in a car with the victims right before the murders. Foster testified that victims Jones and Jenkins were hanging out at his house earlier in the evening on March 7, 2002, and Jones told Foster that he and Jenkins were going to meet Petitioner at the Vincenttown Diner and then go to Philadelphia to Marrero's house. (N.T. 10/12/04 22:4–25.) Jones called Foster about fifteen minutes after he left Foster's house and said that Petitioner was already at the diner for fifteen minutes waiting for him, and that Jenkins was taking too long. (Id. at 25:6–27:17.) About thirty to forty-five minutes later, Jones called Foster again to say that everything was fine and he

---

[13]     Marrero suggested the police locked him up in a room for two to three days without food or a shower and "hit[] [him] up a little bit" in order to force him to give the statement. (N.T. 10/12/04, 66:13–67:21.) Boonsong indicated that he went to the police station because the police had his truck, after Marrero had been stopped driving it. (Id. at 164:15–165:17.)

was "on the way." (Id. at 28:2–23.)  Foster told Jones to call him when he got there and "everything was over."  (Id.)  Foster never heard from Jones again, but continued to try and call him throughout the night.  (Id. at 29:24–30:8.)

Foster went on to testify that he received a phone call about the murders early the next morning and, as a result, he and two friends went into Philadelphia, at about 7:30 a.m., to try to find Marrero's house.  (Id. at 30:8–31:21.)  When he got near the intended location—only blocks away from the crime scene—he saw Petitioner and Marrero's brother coming out of an alley.  (Id. at 33:5–11.)  Foster and Petitioner made eye contact, and Petitioner ran back into the alley and into a door.  (Id. at 34:2–21.)  Petitioner and Marrero's brother then came back out, got into a car, and ran a red light, leaving behind Foster who was attempting to follow them.  (Id. at 34:24–35:25.)

Finally, Catherine Johnson—victim Danny Jones's girlfriend—testified about a very brief phone conversation she had with Jones the night before the murder where he said he was "going to be late because he was getting up with Klein."  (N.T. 10/12/04, 142:13–24.)  This evidence provided corroboration for Foster's testimony that Petitioner was with the victims right before the crime.

In summary, the prosecution presented:  evidence of motive; two confessions (albeit recanted); law enforcement corroboration of those confessions; evidence that Petitioner was with the victims on the night of the murders; and evidence placing him near the crime scene the morning after the murders.  The strength of the trial evidence presented against Petitioner diminishes the likelihood that exclusion of the flight and alias evidence would have brought about a different result.

It is also important to note that while the flight and alias evidence was improperly introduced, it was not so suggestive of guilt as to clearly have impacted the trial.  Petitioner did not flee the area within days or weeks of the crime.  Rather, the evidence showed that Petitioner did not leave for California under an alias until approximately six months after the murders, and there was

no clear proof that Petitioner knew he was wanted for the crime at that point or that he left to avoid arrest. And evidence was also introduced establishing that Petitioner had legitimately gone to Las Vegas to work with a rap group known as the Wu Tang Clan. (N.T. 10/12/04, 111:6–17.) In the jury instructions, the trial judge explained that "[a] person may leave the state or flee or hide and have some other motive and may do so even though he is innocent. Whether or not this evidence of the defendant being out of state at the time of his arrest in this case should be looked at as tending to prove guilt depends on the facts and circumstances of this case, especially upon any motive which may have prompted him to leave the state." (N.T. 10/14/04, 93:1–21.)

Considering the evidence collectively under the standard set forth in Strickland, I cannot find that counsel's failure to object to the hearsay evidence, the closing statement, or the flight charge had the reasonably likely impact of tipping the scales sufficiently in favor of a guilty verdict. A careful examination of the trial record leaves no reasonable probability that, but for counsel's failure to object to the admission and use of evidence regarding Petitioner's flight to California under an alias, the jury would have had a reasonable doubt as to whether Petitioner was the actual culprit.

## IV.    CONCLUSION

Ultimately, I find that notwithstanding the errors in trial counsel's performance, Petitioner has failed to establish that he suffered prejudice as a result of counsel's failure. Therefore, I decline to grant the writ of habeas corpus.

Having reached that conclusion, I also conclude that reasonable jurists could take a different view of the trial court record and disagree with my conclusion on the prejudice element of Strickland. 28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue . . . if the applicant has made a substantial showing of the denial of a constitutional right." "A petitioner

satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller–El v. Cockrell, 537 U.S. 322, 327 (2003). As Petitioner has met this standard, I will issue the certificate of appealability.

An appropriate Order follows.